IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAWN SPROLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19 C 04131 |
| ) | |
| THE NORTHEAST ILLINOIS ) | Judge John J. Tharp, Jr. |
| REGIONAL COMMUTER ) | |
| RAILROAD CORPORATION d/b/a ) | |
| METRA; and JOSEPH M. PEREZ, in ) | |
| his individual and official capacity as ) | |
| Metra Chief of Police, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

For the reasons set forth in the Statement below, the motion to dismiss by defendants Northeast Illinois Regional Commuter Railroad Corporation, doing business as Metra, and Joseph M. Perez [17] is granted. The plaintiff has leave to file an amended complaint within 21 days from entry of this Order or the case will be dismissed.

**STATEMENT**

Shawn Sproles was employed as a Metra police officer from September 2006 through January 18, 2018. Am. Compl. ¶¶ 13, 38. Prior to his employment with Metra, Sproles worked at the VA Hines Medical Center and as a special agent with the Norfolk Southern Railroad; in all, Sproles has nearly thirty years of law enforcement experience and is trained as an Illinois State Certified Paramedic. *Id.* at ¶¶ 12, 14, 18. Sproles is African American. *Id.* at ¶ 8.

On December 13, 2017, Sproles was called to assist two other Metra police officers in the arrest of a trespasser at the Matteson Metra Train Station. *Id.* at ¶¶ 17, 20. This man was "well-known to Metra and the Olympia Fields Police Departments." *Id.* at ¶ 17. Sproles was aware that the individual was diagnosed with bipolar disorder and knew that, when the man was unmedicated, he was prone to disruptive and violent behavior. *Id.* at ¶ 17. The individual resisted Metra police officers' attempts to take him into custody and was not complying with the officers' verbal commands. *Id.* at ¶¶ 20-21. Sproles removed his taser and touched it to the man's neck but did not discharge it. *Id.* at ¶¶ 23-25. The man "then immediately responded" to Sproles's verbal directions and was taken to the hospital for mental health treatment. *Id.* at ¶ 26.

The arrestee did not complain to Metra that Sproles used excessive force against him. *Id.* at ¶ 27. However, Sproles wrote a "full and accurate report of the arrest," including a full recounting of his placement of the taser against the individual's neck. *Id.* at ¶ 28. Shortly thereafter, Sproles was told that he would be suspended without pay and that the incident would be

investigated and subject to a hearing on the charge of Use of Excessive Force, based on Sproles's arrest report. *Id.* at ¶ 29; Ex. C (December 15, 2017, notice to Sproles that he was "hereby withheld from service on unpaid leave" while the department investigated the December 13, 2017, incident; Sproles was ordered to "surrender [his] issued firearm(s), star, keys, radio, computer and Metra Police Identification Card"). Prior to the December 13, 2017, incident, Sproles had never been subject to disciplinary action or reprimand for his conduct. *Id.* at ¶ 35.

Sproles alleges that he was informed about the suspension and disciplinary investigation by Metropolitan Alliance of Police President, Joseph Kresch; he alleges that Kresch had received that information from Deputy Chief of Police, Paul Riggio, at the direction of the Metra Chief of Police, defendant Joseph Perez. *Id.* at ¶ 29. Kresch told Sproles that if the matter proceeded to the scheduled hearing, Sproles would be fired. *Id.* at ¶ 31. If he chose to forego the hearing, Sproles would be given an opportunity to resign rather than face termination. *Id.* at ¶ 34. Sproles alleges that, during his tenure at Metra, he had come to understand that disciplinary hearings under the Railway Labor Act "always confirmed decisions already made by the Defendants prior to the Hearings." *Id.* at ¶ 32. This, in combination with Chief Perez's "evasive response" when Sproles asked him about rumors that Perez was interested in terminating him, led Sproles to conclude that the "least damaging option to the continuation of his policing career" would be to resign, rather than face the "guaranteed firing" he believed awaited him at the disciplinary hearing. *Id.* at ¶ 38. On January 18, 2018, before the disciplinary hearing was held, Sproles resigned. *Id.*

After Sproles's resignation, Perez submitted a professional conduct report to the Illinois Law Enforcement Training and Standards Board ("ILETSB"). Law enforcement agencies are required to file a report with the Board if the agency makes a final determination that there has been a willful violation of department or agency policy, official misconduct, or a violation of law, and the accused officer resigned after receiving notice that they were under investigation based on the commission of a Class 2 or greater felony. *Id.* at ¶ 39; Ex. E. Sproles alleges that there could not have been a final determination about his alleged violation in the absence of a disciplinary hearing and, moreover, that Metra did not notify him that he was under investigation for the alleged commission of an Illinois felony offense. *Id.* at ¶¶ 41-42; Ex. D (informing Sproles that he was charged with alleged violations of Metra Employee Code of Conduct Rules B and N and Metra Police Department Policies 300 and 304). ILETSB action could result in the revocation of Sproles's license to work as a police officer and to carry a weapon. *Id.* at ¶ 45.

Sproles contends that the discipline he faced was part of a broader pattern or practice of racial discrimination by Metra against Black employees. Metra has a five-step progressive discipline policy. *Id.* at ¶ 37. However, Sproles alleges that he and other Black Metra police officers were aware that the five-step policy was both accelerated against and resulted in disproportionately excessive punishment for Black officers. *Id.* He gives several examples he believes illustrate this practice, *id.* at ¶¶ 50-55, and identifies three non-Black officers who were not disciplined for arguably similar infractions involving the use of excessive force. *Id.* at ¶ 54 (a canine officer who detained a juvenile in a dog kennel with the dog; an officer "known to severely beat arrestees," with some abuse captured on videotape; and an officer written up but not otherwise disciplined for use of excessive force, including two tasering incidents). He also alleges that at least twelve Black officers have been terminated during Perez's tenure as Metra Chief, and that those officers were not afforded the same procedural protections throughout the disciplinary process as similarly situated white or Hispanic officers. *Id.* at ¶¶ 58, 62-63.

Sproles's amended complaint includes three counts based on two claims: first, that during his tenure as a Metra police officer, Sproles was subject to a race-based hostile work environment, and second, that Metra treated him differently than similarly-situated non-Black peers in initiating the disciplinary action against him. He brings these claims under both Title VII and Section 1983 and against both Metra and Metra Police Chief Perez in his individual and official capacities. The defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* Defs.' Mot. Dismiss, ECF No. 17. A Rule 12(b)(6) motion tests the sufficiency of a plaintiff's claim; it requires the court to assess whether a litigant has "state[d] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bhalerao v. Ill. Dep't of Fin & Prof'l Regulations*, No. 11 C 7558, 2012 WL 5560887, at *2 (N.D. Ill. Nov. 15, 2012) ("A motion to dismiss pursuant to 12(b)(6) tests the sufficiency of the complaint, not the merits of the case."). At this early stage of the proceedings, the Court must accept as true well-pleaded facts and draw reasonable inferences in favor of the plaintiff. *See Ezekial v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

1. Racial Discrimination/Disparate Treatment

Sproles's complaint raises two possible theories of liability: disparate treatment and a hostile work environment. Both claims are actionable under both Title VII and Section 1983. *Barnes v. Bd. of Trustees*, 946 F.3d 384, 389 (7th Cir. 2020); *see also Cole v. Bd. of Trustees*, 838 F.3d 888, 899 (7th Cir. 2016) ("The same requirements for proving race discrimination apply to claims under Title VII and the Equal Protection Clause.").

Sproles's first claim is that he was disciplined more harshly than his non-Black peers would have been for placing his taser against an arrestee's neck during the December 13, 2017, arrest. A plaintiff pleading race discrimination does not need to provide a comprehensive factual basis for his claim—a "complaint must contain something more than a general recitation of the elements," but there is only a "minimal pleading standard for simple claims of race or sex discrimination." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) ("[I]n order to prevent dismissal under Rule 12(b)(6), a complaint alleging [race] discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of h[is] [race]."). And, taken as a whole, Sproles's allegations fit the Title VII disparate treatment framework. *See, e.g.*, *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) ("To establish a Title VII disparate treatment claim, a plaintiff must allege that an employer took job-related action against him which was motivated by intentional discrimination."); *Luster v. Ill. Dep't of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011) ("Under Title VII . . . an employer cannot intentionally discipline poor employees more severely on the basis of race, sex, religion, or national origin.").

The Court agrees with the defendants, however, that Sproles fails to plead an adverse job-related action because his voluntary resignation did not, at a matter of law, constitute constructive discharge. *See* Defs.' Memo. Supp. Mot. Dismiss 3, ECF No. 18; *Bliss*, 864 F.3d at 552 (describing an adverse employment action as a "materially adverse change in the terms and conditions of employment"). Sproles claims he was constructively discharged on January 18, 2018, because he resigned in the face of the "threat of a guaranteed firing" after the disciplinary hearing. Am. Compl. at ¶ 38. A plaintiff relying on a constructive discharge theory must demonstrate, however, that their "working conditions [were] so intolerable that the employee [was] forced into an involuntary resignation." Defs.' Memo. Supp. at 3, *citing Bartman v. Allis Chalmers Corp.*, 799 F.2d 311, 314

(7th Cir. 1986). Plaintiffs can do so in two different ways. First, the plaintiff may allege that they faced such severe discriminatory harassment that they were compelled to resign—in these scenarios, courts require that the plaintiff demonstrate a working environment with conditions "*even more egregious* than those required to support a hostile work environment claim." *Id.* (emphasis in original). Second, a plaintiff may demonstrate that their employer "act[ed] in a manner so as to have communicated to a reasonable employee that [h]e will be terminated, and the plaintiff employee resigns." *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). However, because a plaintiff must still demonstrate that his working conditions were intolerable, the mere "prospect of discharge lurk[ing] in the background" does not suffice. *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004). The plaintiff must demonstrate with some certitude that the firing was imminent; in other words, that "the handwriting was on the wall and the axe was about to fall." *Univ. of Chicago Hosps.*, 276 F.3d at 332 (internal alterations and quotations omitted) (finding constructive discharge where the complainant arrived at work to find her belongings packed and her office being used as storage; a recently-fired employee told the complainant their supervisor had the "intent, plan, and attempt to terminate her as well"; complainant's performance evaluations deteriorated and she faced "repeated accusations of her failure to follow directives"; and supervisor told complainant that failure to remember the location of several test scores was "the last straw"); *cf. Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 492, 502 (7th Cir. 2010) (employee's resignation constituted constructive discharge where supervisor "handed [the employee] a letter of resignation and informed him that he could resign or be terminated immediately").

Sproles does not adequately plead constructive discharge under either method. As discussed in the next section, Sproles's complaints about unwarranted criticism of his work and rumors regarding the possibility of his termination do not rise to the level of—let alone describe conditions more egregious than that required to demonstrate—a hostile work environment. Nor does the complaint plausibly allege that Sproles's firing was certain and imminent, such that his decision to resign constituted constructive discharge. The only alleged indications that Sproles's firing was the predetermined outcome of the disciplinary investigation were 1) a conversation with union president Joseph Kresch, who told Sproles that he heard from Deputy Chief Riggio, who heard from Chief Perez, that Sproles would be fired if the matter proceeded to the hearing; and 2) Chief Perez's "evasive response" when Sproles questioned him about the hearing based on rumors "circulating in the Metra Police Department" about Chief Perez's "interest in terminating him." Am. Compl. ¶¶ 31, 36. This word-of-mouth chain is too attenuated to plausibly transform Sproles's voluntary resignation into a constructive discharge; treating it as such would allow Sproles to make an end-run around the agency's seemingly robust disciplinary hearing process[1]

---

[1] Sproles's complaint includes the conclusory accusation that Railway Labor Act Hearings "always confirmed decisions already made by the Defendants prior to the Hearings," because Metra has "full control over . . . the selection of participants, procedures and the outcome." Am. Compl. ¶¶ 32, 33. This characterization of the process is contradicted to some degree by Metra's notice of investigation, which describes the purpose of the agency's investigation as "develop[ing] the facts, determin[ing] the cause, and assess[ing] [Sproles's] responsibility, if any" for the charge of use of excessive force; informs him that he may be represented at the hearing; and lists at least eight witnesses that will be called at the hearing before a hearing officer. *Id.* Ex. E. Without any further factual substantiation for his characterization of the process as rigged, Sproles's distrust of

based on his own perception that the outcome of that hearing was inevitable. *Compare Cigan*, 388 F.3d at 333-34 (observing that it "would be odd" for courts to treat the mere commencement of an agency's disciplinary or discharge process as a final decision to discharge, as "[t]he only way to know how matters will turn out is to let the process run its course," and "[l]itigation to determine what *would* have happened . . . is a poor substitute for the actual results of real deliberation within the employer's hierarchy"); *see also Wilkerson v. Springfield Public Sch. Dist. No. 186,* 40 F. App'x 260, 262-63 (7th Cir. 2002) (union president's comment to employee after disciplinary meeting that "As far as I'm concerned, you're screwed" did not constitute evidence that employee *would* have been fired had he not resigned, so did not support claim of constructive discharge).

Because Sproles's complaint does not adequately plead that he suffered an adverse employment action[2] due to the alleged racially discriminatory conduct by Metra and Chief Perez, the motion to dismiss is granted as to Sproles's Title VII and Section 1983 disparate treatment claims.

2. Hostile Work Environment

Sproles's hostile work environment claim does not survive, either. To state a Title VII hostile work environment claim, Sproles must allege that he was subject to unwelcome race-based harassment so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). Evaluating the hostility of a work environment requires consideration of various factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonable interferes

---

Metra's disciplinary process does not make his allegations about the certainty or imminence of his discharge more plausible.

[2] Sproles does not argue in his response in opposition to the motion to dismiss that either the agency's decision to place him on unpaid leave or Chief Perez's submission of the ILETSB professional conduct report, standing alone, is an adverse employment action for purposes of his Title VII disparate treatment claim. *See* Pl.'s Resp. Opp'n 3-4, ECF No. 24 (describing Perez's submission of the allegedly unwarranted ILETSB report as "strongly support[ing] the Plaintiff's belief that Defendants intended to fire him," but not as an adverse employment action itself); *see generally* Pl's Resp. Opp'n (no mention of being placed on unpaid leave). There are colorable, though not unassailable, arguments that one or both of those job-related actions suffices as a predicate for Sproles's Title VII claim. *See, e.g.*, *Soni v. Wespiser*, 239 F. Supp. 3d 373, 383-84 (D. Mass. 2017) (noting that the provision of a negative reference to a prospective employer may constitute an adverse employment action, and observing that several circuits have "recognized that, with respect to Title VII, the employment relationship extends into the post-employment period with respect to the provision of references"); *Tyler v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 18 CV 1786, 2018 WL 5977925, at *2 (N.D. Ill. Nov. 14, 2018) ("A suspension without pay is a materially adverse employment action."), but the Court will not make the plaintiff's arguments for him here. If the plaintiff chooses to amend his complaint to address its current deficiencies, however, factual elaboration about Metra's policies regarding unpaid leave pending disciplinary review or the submission of ILETSB conduct reports may be enough for Sproles's claims to proceed to discovery.

with an employee's work performance. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). At the pleadings stage, however, it is enough that the plaintiff "has pleaded facts that could amount to violations of the relevant laws." *Abney v. Bd. of Educ.*, No. 20 C 3621, 2021 WL 268210, at *2 (N.D. Ill. Jan. 27, 2021).

Even under this standard, however, Sproles's claim cannot survive the motion to dismiss. His allegations are scarce. At a very general level, he states that "the racially discriminatory behavior and disparate treatment" within Metra "has caused a hostile work environment for him" and other Black Metra police officers. Am. Compl. at ¶ 56. Somewhat more specifically, he alleges that, during his tenure, he was "regularly harassed by [Lieutenant] Cioni . . . who made unwarranted and unsubstantiated criticism of his work." *Id.* at ¶ 16 (noting also that Cioni has recently been promoted to the rank of Captain within the Metra police). He also claims that after the December 13 incident, rumors circulating about Chief Perez's interest in terminating him "increased [his] perception of the hostile work environment," and that he resigned, in part, rather than "continuing to endure the hostile environment" he perceived while "awaiting a termination." *Id.* at ¶¶ 36, 38. But these allegations cannot amount to a hostile work environment—the complaint does not aver that the alleged unwarranted criticism from Lieutenant Cioni or the rumors regarding Sproles's allegedly impending termination were race-based harassment, nor does it describe race-based harassment so severe and pervasive as to alter the conditions of Sproles's employment with Metra. *See Lilly v. Roadway Express, Inc.*, 6 F. App'x 358, 359 (7th Cir. 2001) (noting that "the complained-of conduct need not be explicitly racial" but a plaintiff "must show that the conduct has a racial character or purpose"); *Abrego v. Wilkie*, 907 F.3d 1004, 1015-16 (7th Cir. 2018) (plaintiff's supervisors being "short tempered, hostile, unfairly critical, and disrespectful" did not create objectively offensive environment). Even if the alleged general racially discriminatory behavior that Sproles witnessed toward other Black Metra officers is characterized as "second-hand" harassment affecting Sproles's own conditions of employment, *see, e.g.*, *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005), the totality of the circumstances Sproles describes does not plausibly plead that he was subjected to a "workplace permeated with discriminatory intimidation, ridicule, and insult." *Abrego*, 907 F.3d at 1015 (alterations omitted). His hostile work environment claims under Title VII and Section 1983 are therefore dismissed.

For the foregoing reasons, the defendants' motion to dismiss [17] is granted. Sproles has leave to file an amended complaint within 21 days, if he can address the deficiencies in his claims. If Sproles does not amend his complaint within that timeframe, this case will be dismissed.

Dated: April 26, 2021

John J. Tharp, Jr.
United States District Judge